**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------x

J. REID GRAY, III, ESQ.,                    :

               Plaintiff,        :     **REPORT AND RECOMMENDATION**

      -against-                  :     **13 Civ. 8717 (JGK)(MHD)**

PROTEUS SPORTS AND RACING CARS LTD,:

           Defendant.      :
------------------------------------x

9/4/14


TO THE HONORABLE JOHN G. KOELTL, U.S.D.J.:

On December 9, 2013, plaintiff J. Reid Gray III, Esq. ("Gray") filed a pro se complaint against defendant Proteus Sports and Racing Cars Ltd. ("Proteus"). He alleges breach of contract, conversion, and unjust enrichment stemming from defendant's repudiation of a contract to build a reproduction of a classic car for plaintiff.

On April 14, 2014, the District Court ordered that a default judgment be entered against defendant, and subsequently referred this case to me for an inquest on damages. (See Order, dated Apr. 14, 2014 (Dkt. No. 11)). For the reasons set forth below, I recommend that judgment be entered against defendant Proteus for damages in the amount of $102,042.70 plus prejudgment interest and costs.

**BACKGROUND**

**I. Factual Background**

**A. Original Contract with Proteus Sports Cars: July 30, 2000-July 2009**

On July 30, 2000, plaintiff contracted with defendant's predecessor in interest, Proteus Sports Cars ("PSC"), to buy an existing partially constructed reproduction of a C-Type Jaguar automobile and have it brought to road-worthy condition. (Aff. of J. Reid Gray, III, Esq. Regarding Damages, dated May 14, 2014 (Dkt. No. 16) ("Gray Aff.") at ¶ 3). The contracted price was £43,920, of which £22,500 represented the price of the car in its then-current state and £21,420 represented the price of labor and materials required to bring it to road-worthy condition. (Id. at ¶ 3 & Ex. A). The original contract was signed by John Gregson ("Gregson"), the principal of PSC. (Id.).

Between June 2000 and May 2007, plaintiff and Gregson agreed to raise the total purchase price several times to cover cost increases. Ultimately, on May 6, 2007, they agreed that the final price would be £85,000.00. (Id. at ¶ 2a[1] & Ex. B).

----

[1] Plaintiff's affidavit repeats the numbers "2" and "3" twice when numbering paragraphs. For clarity's sake, we use "2a" and "3a" to refer to the paragraphs on the second page of his

On July 28, 2000, plaintiff paid PSC $8,000 by personal check, which was converted by PSC to £5,323.40 at the then-current exchange rate. (Id. at ¶ 3a & Ex. C-1). The payment was confirmed by Gregson in a letter to plaintiff dated August 18, 2000. (Id. at Ex. C-1). Plaintiff sent another $8,000 by wire transfer to PSC on January 8, 2001, which was converted by PSC to £5351.89 at the then-current rate. (Id. at ¶ 3a & Ex. C-2). On March 13, 2001, Gregson faxed plaintiff a receipt for the January 8 payment and confirmed that plaintiff had paid $16,000 in total. (Id. at Ex. C-2).

On April 30, 2001, plaintiff sent $20,000 by wire transfer to PSC, which was converted to £13,995.80 at the then-current exchange rate. (Id. at ¶ 3a).[2] On or about June 15, 2001, plaintiff sent another $20,000.00 wire transfer to PSC, which was converted to £14,236.00 at the then-current exchange rate. (Id. at ¶ 3a & Exs. C-3, C-4). On August 20, 2004, plaintiff transferred $17,500.00 to PSC, which was converted into £10,000.00 at an agreed-upon rate. (Id. at ¶ 3a & Ex. C-5).

_____

affidavit.

[2] Plaintiff cites to Ex. C-3 as supporting evidence for this statement, but Ex. C-3 seems to speak to his June 15, 2001 payment of $20,000. (See id. at Ex. C-3).

3

On April 24, 2007, plaintiff wrote to Gregson, asking about the current status of the production as well as seeking to confirm the car's price and expected completion date. (<u>Id.</u> at Ex. C-5). Plaintiff stated in the letter that the estimated cost was "around £60,000 (at the time about US $90,000)" and reported that he had already paid £34,671.09 ($53,500.00). (<u>Id.</u>).

On May 6, 2007, Gregson wrote a letter to plaintiff stating that the company had been sold but had a license to complete back orders, and now operated under the name of Gregson Polska out of Poland. (<u>Id.</u> at Ex. B). Regarding the status of the car, Gregson reported that the back-end and body shape were unfinished because they had been incorrectly engineered and shaped, requiring PSC to start over. (<u>Id.</u>).

Gregson further stated that because prices had "altered across the whole globe", he could not produce plaintiff's car for less than the cost price of £85,000.00. (<u>Id.</u>). He acknowledged that plaintiff had "already paid £34/35 thousand." (<u>Id.</u>). Finally, Gregson stated that, barring any unforeseen circumstances, the car would be "finished by Christmas and by the very latest March 2008." (<u>Id.</u>).

On June 29, 2007, plaintiff transferred £10,000.00 to Gregson Polska ($20,009 at the then-current exchange rate). (Id. at ¶ 3a & Ex. C-6). By letter dated July 31, 2007, Gregson confirmed receipt of the £10,000 and stated that as of that date, plaintiff had paid a total of £44,671.09. (Id.).

On or about May 2, 2008, plaintiff transferred a last payment of £5,000.00 to Gregson Polska ($9,915.50 at the then-current exchange rate). (Id. at ¶ 3a & Ex. C-7).

B. **New Contract: July 2009**

On July 21, 2009, plaintiff received an email from Nigel Forsyth ("Forsyth") stating that both John Gregson and his company, PSC, were bankrupt as of August 2008, and that Gregson had sold the company and had since passed away. (Id. at Ex. D). Forsyth wrote that he was now the chairman and principal shareholder of the new Proteus Sports and Racing Cars Ltd. ("Proteus"). (Id. at ¶ 4 & Ex. D). Forsyth reported that he did not have any knowledge of plaintiff's car or many of his prior payments, but that he had found evidence -- through John Gregson's son, Robert Gregson -- that plaintiff had paid £27,000 to Gregson Polska in 2007 and 2008. (Id. at Ex. D). As to the balance, Forsyth wrote that the "other funds appear to have

disappeared into a 'black hole' in Mr. Gregson's past estate." (<u>Id.</u>).

By e-mail on or about July 21, 2009, Forsyth informed plaintiff that the "narrow chassis and body" of his car remained in a Polish factory, but that the body needed to be changed. (<u>Id.</u> at Ex. E). Forsyth told plaintiff that Proteus "will produce a standard spec car for you once the final detail is confirmed", and that Proteus "can account for £30K of your monies received." (<u>Id.</u>). He went on to say, somewhat ambiguously, "we did not purchase debts and liabilities from Gregson and your money 'disappeared' before our involvement." (<u>Id.</u>).

Plaintiff and Forsyth renegotiated the contract terms through emails and telephone conversations. A new contract was agreed upon through email communications dated August 17 and 18, 2009 and May 25 and 26, 2010. (<u>Id.</u> at ¶ 6 & Ex. F). The new contract superseded and replaced the plaintiff's original contract with PSC. (<u>Id.</u> at ¶ 6). Under the new contract, defendant agreed to build and deliver to plaintiff a newly manufactured reproduction of a C-Type Jaguar rather than finish or refurbish the original car. (<u>Id.</u> at ¶ 6 & Ex. F). Plaintiff and defendant further discussed and determined changes of certain elements of the new car. (<u>Id.</u>). Under the new contract, plaintiff

asserts, he agreed that the consideration for the new car would be (1) the monies already paid to defendant; (2) a transfer of plaintiff's title to the original car to defendant; and (3) an additional payment of £25,400.00 to defendant to be paid upon delivery of the new car. (Id. ¶ 6).[3]

By email dated January 27, 2011, Andrew Forsyth, a director of Proteus, reported to plaintiff that the body and chassis designated to him had been used to satisfy another client because plaintiff had "been silent for some time now and e-mails to [him had] gone unanswered." (Id. at Ex. H). He also stated that Robert Gregson, the son of the deceased John Gregson, had "locked himself in" at Proteus' plant in Poland and would not supply any C-type bodies or chasses to the Forsyths. (Id.). He suggested that plaintiff contact Robert Gregson for compensation, and offered to build plaintiff a new Proteus C-Type for the price of £64,500.00. (Id.).

Plaintiff contacted Nigel and Andrew Forsyth by email on January 27, 2011 and again on February 8, 2011 in an attempt to

---

[3] The annexed emails from Forsyth are less clear as to whether defendant was agreeing that it had received any funds on account of the new car that it was to manufacture or was deeming the contract price to include such funds. (Id. at Ex. F).

have the contract honored, but received no response. (<u>Id.</u> at ¶ 7 & Ex. G).

## **Procedural History**

Plaintiff filed his complaint on December 9, 2013, alleging breach of contract, conversion, breach of the duty of good faith and fair dealing, and unjust enrichment. (<u>See</u> Compl. (Dkt. No. 1)). Defendant was served on January 6, 2014, with its answer due March 7, 2014. (Dkt. No. 3). On April 14, 2014, after defendant had failed to appear, the District Court granted plaintiff's application for a default judgment against defendant and referred the case for an inquest on damages. (Dkt. Nos. 11-12). Following a pre-inquest conference on May 5, 2014 -- at which defendant did not appear -- we authorized plaintiff to serve and file papers in support of his damages request and directed that defendant respond by June 9, 2014. (Dkt. No. 14). Plaintiff timely filed his papers, and defendant has failed to submit a response.

## ANALYSIS

## I. Damages-Assessment Standard

Upon entry of a default, a trial court performing an inquest on damages "should accept as true all of the factual allegations of the complaint, except those relating to damages, and [a] plaintiff [is] also entitled to all reasonable inferences from the evidence offered". Fed. R. Civ. P. Rule 55(a), (b)(2), 28 U.S.C.A. See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61 (2d Cir. 1981); see also  Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009). However, a court has discretion to determine whether the facts alleged in a complaint state a legally sufficient cause of action. See In re Crazy Eddie Sec. Litig., 948 F. Supp. 1154, 1160 (E.D.N.Y. 1996). As for damages, "[u]nless the amount is liquidated or susceptible to mathematical computation", plaintiff must establish the quantum of damages in a post-default inquest, the defendant has an opportunity to contest the plaintiff's application. See Flaks v. Koegel, 504 F.2d 702, 707 (2d Cir. 1974); see also Norcia v. Dieber's Castle Tavern, Ltd., 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013). The court may rely on affidavits or documentary evidence in evaluating the fairness of the sum requested. See Tamarin v. Adam Caterers, Inc., 13 F.3d

51, 54 (2d Cir. 1993); see also Barrera v. Brooklyn Music, Ltd.,
346 F. Supp. 2d 400, 408 (S.D.N.Y. 2004).

The calculation of the appropriate amount of damages involves
a two-step process: (1) "determining the proper rule for
calculating damages on . . . a claim"; and (2) "assessing
plaintiff's evidence supporting the damages to be determined
under this rule." Credit Lyonnais Sec. (USA), Inc. v. Alcantara,
183 F.3d 151, 155 (2d Cir. 1999); see also Braccia v. D'Blass
Corp., 2011 WL 2848146, at *3 (S.D.N.Y. June 13, 2011), adopted,
2011 WL 2848202 (S.D.N.Y. July 18, 2011); Fed. R. Civ. P. 55(a).
Damages must be established "with reasonable certainty," see
Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,
Div. of Ace Young Inc., 109 F.3d 105, 111 (2d Cir. 1997), and
based only on admissible evidence. See House v. Kent Worldwide
Mach. Works, Inc., 359 Fed. App'x. 206, 207 (2d Cir. 2010);
Braccia, 2011 WL 2848146, at *3; see also Norcia v. Dieber's
Castle Tavern, Ltd., 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013).

## II. Assessment of Plaintiff's Claims

Plaintiff seeks compensatory damages of $98,150.00 on his
breach of contract claim, reflecting the asserted market price of
the second car, less expenses saved by him. He further asks for

an award of $83,590.50 on his conversion claim, based the sums of money that he paid both the original Proteus entity and later the defendant. Finally, he requests $83,590.50 on his unjust enrichment claim, premised on the same payments made to the two Proteus companies. In addition, he asks for an award of prejudgment interest. (Pl.'s Mem. of L. Regarding Inquest on Damages, dated May 14, 2014 (Dkt. No. 17) ("Pl.'s Mem.") at 3-5). Moreover, in his complaint, although not in his inquest papers, he requests an award of attorney's fees. (Compl. ¶¶ 23, 27, 31).

A.   **Breach of Contract**

"To prevail on a breach of contract claim under New York law, a plaintiff must prove [i] a contract; [ii] performance of the contract by one party; [iii] breach by the other party; and [iv] damages." See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000) (internal quotations omitted); Furia v. Furia, 116 A.D.2d 694, 695, 498 N.Y.S.2d 12, 13 (2d Dep't 1986); see also Dolphin Direct Equity Partners, LP v. Interactive Motorsports & Entm't Corp., 2009 WL 577916, at *7 (S.D.N.Y. Mar. 2, 2009), aff'd, 419 F. App'x 60 (2d Cir. 2011). Plaintiff's complaint pleads all of the elements of his breach claim, including an allegation that defendant was "the successor in

interest" to Proteus Sports Cars, the original putative contracting supplier of plaintiff's car. (Compl. ¶ 12).

Plaintiff has provided, by way of documentation and affidavit, sufficient evidence that he had two contracts -- the first with the original Proteus entity and then with the defendant -- and that he had substantially performed on the first contract by making regular installment payments. (Gray Aff. ¶¶ 3a, 5, 6 & Ex. F). He has also provided evidence that the original Proteus entity and then the defendant breached their respective contracts, by failing to deliver either the original car or the new car, and by denying him a refund of the monies he had already paid. (Id. at ¶¶ 7-8, Ex. G). Lastly, he has submitted evidence bearing on the damages he suffered by reason of the breaches. On this claim he seeks a total of $98,150.00. (Id. at ¶¶ 3a, 9 & Exs. C-1-C-7).

Breach-of-contract damages are intended to place a party in the same position as he or she would have been in if the contract had not been breached. See, e.g., Restatement (Second) of Contracts §§ 344, 347 (1981). Of course, "the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes." Kenford Co. v. County of

Erie, 67 N.Y.2d 257, 261, 502 N.Y.S.2d 131, 132 (1986). Plaintiff
satisfies this standard.

    Plaintiff calculates his contract damages -- which refer
solely to the breach of the agreement with defendant -- based on
the market value of the new car, which at the time of the breach
by defendant was $135,937.50 (£87,000.00).[4] He then adds the
costs of the litigation ($1,900.00), and deducts the amount still
due on the car which was avoided by plaintiff when defendant
repudiated the contract ($39,687.50 (£25,400.00)). (Pl.'s Mem. 2-
3). Putting to one side the question of taxable costs, this
method of calculation appears to be an attempt to comply with the
general terms of the Restatement (Second) of Contracts, and the
more specific provisions in N.Y. U.C.C. § 2-713(1)(a), which
authorizes damages measured as the difference between the market
price of the item to be delivered and the contract price. See,
e.g., Webster v. DiTrapano, 114 A.D.2d 698, 699, 494 N.Y.S.2d
550, 551 (3d Dep't 1985).

    The complication introduced in this case in using this
formula is that the record as to the precise terms of the second

_____

[4] Plaintiff derives this amount from defendant's email to
plaintiff, dated January 27, 2011, where Andrew Forsyth wrote,
"We at Proteus can only build the new Proteus C Type now, which
retails at £87,000 including UK VAT." (Gray Aff. Ex. H).

contract -- on which plaintiff currently sues -- are somewhat ambiguous. There is no question that plaintiff agreed to pay £25,000. Moreover, Forsyth confirmed that defendant had also accounted for an earlier payment of £30,000, apparently to defendant's predecessor, but his further reference to all of plaintiff's prior payments having disappeared leaves open the question of whether the contract price is properly read as £25,000 or £55,000.

Ultimately that ambiguity need not be resolved because we conclude that plaintiff should be awarded all of his prior payments received by this defendant, whether directly or indirectly. See generally Restatement § 344(c) (referring to restitutionary damages). The aim of contract damages is, as noted, to place the plaintiff in the position he would have occupied had the other party not breached. See id. § 344, cmt (a). In this case defendant conceded having taken over assets from the original Proteus entity (see Gray Aff. Ex. D), and we may fairly infer that Forsyth's reference to accounting for the £30,000 can be read to concede that this payment was among the assets that he had acquired. If so, then plaintiff has been deprived of not only the difference between the market price of the car (the £87,000) and the contract price (hypothetically £55,000), but also the £30,000 that he paid to the original

14

Proteus entity that then ended up in the hands of its successor. See generally Restatement § 347(a) & (b)(allowing award of both "loss in value" of contractual quid pro quo benefit caused by non-performance and "any other loss").

Adding this restitutionary award to the lost benefit of the bargain -- calculated at £32,000 (that is, £87,000 less £55,000) yields a contractual award of £62,000, or $102,042.70.[5]

## B. **Conversion**[6]

Plaintiff also seeks damages on a claim of conversion. (See Compl. ¶¶ 27, 31, 35).[7] The basis of an action for conversion is the "denial or violation of a plaintiff's dominion, rights, or possession" of property. Sporn v. MCA Records, Inc., 58 N.Y.2d

---

[5] While it is true that plaintiff has provided documentary evidence that he paid John Gregson -- via PSC and Gregson Polska -- a total of $103,424.50 (see Gray Aff. ¶ 3a & Ex. C), he has also stated that the contract with Nigel Forsyth and Proteus superseded and replaced that prior contract. (Id. ¶ 6). The new contract with Proteus stated that the consideration for the new car would be the amount that Forsyth acknowledged that plaintiff had already paid (£30,000) plus £25,400. (Id. at ¶ 6 and Ex. F).
[6] In his complaint, plaintiff also included a claim for breach of the duty of good faith and fair dealing (Compl. ¶¶ 36-41). However, he omits any mention of this claim in his inquest submissions, and therefore we deem it to be waived.
[7] Similarly, plaintiff in his complaint sought both compensatory and punitive damages under the theory of conversion. (See id.). Because he fails to address punitive damages in his inquest submissions, we also deem this issue waived.

482, 487, 465 N.Y.S.2d 413, 415 (1983). However, a claim of conversion cannot be predicated on a "mere breach of contract." Steinberg v. Zebrasky, 2011 WL 2565498, at *5 (S.D.N.Y. June 14, 2011) (citing, inter alia, Kopel v. Bandwidth Tech. Corp., 56 A.D.3d 320, 320, 868 N.Y.S.2d 16, 17 (1st Dep't 2008)).

Here, plaintiff bases his conversion claim on the allegation that defendant "deliberately, knowingly, intentionally, wilfully, wrongfully, maliciously, with wanton disregard for [p]laintiff's rights and/or with gross negligence, misappropriated" the original car, the new car, and the monies that plaintiff had already paid to defendant. (Id. at ¶¶ 25, 29, 33). Thus, his conversion claim is based in part on defendant's breach of contract, and he has not alleged any obligation on the part of the defendant arising independently of the contract. See Steinberg, 2011 WL 2565498, at *6.

The balance of plaintiff's request for relief on his conversion claim rests on his payments to the original Proteus entity. This aspect of his claim is not precluded by his contract claim against defendant, since it does not rest on the contract that he entered into with the defendant. Arguably, though, this aspect of his conversion claim is indistinguishable from a contract claim against the defunct Proteus entity, since he is

16

targeting the receipt by that company of his payments under the original contract, which that prior entity breached by its non-delivery of the first car that plaintiff ordered and largely paid for.

This point does not bar consideration of the claim, which is at worst mislabeled as a conversion claim rather than one for breach of contract. In assessing the adequacy of a claim, we are not limited by the possibly erroneous legal labels attached to the claim, provided that the facts alleged may constitute a cognizable claim of some sort. See, e.g., Simonton v. Runyon, 232 F.3d 33, 336-37 (2d Cir. 2000); Northrup v. Hoffman Simsbury, Inc., 134 F.3d 41, 45-46 (2d Cir. 1997); Sabilia v. Richmond, 2011 WL 7091353, at *26 (S.D.N.Y. Oct. 26, 2011). The more difficult question is whether plaintiff may recover against the defendant for the actions of its predecessor, an issue that plaintiff never directly confronts.

We note that the complaint and plaintiff's damages application treat the current defendant as the successor in interest to the first Proteus entity, and seek recovery of the entirety of plaintiff's payments to both of these entities. Defendant has chosen not to appear to contest liability, and it has equally failed to appear to contest damages. Notwithstanding

this default, we must assess whether plaintiff has proffered evidence suggesting that his implicit claim of corporate-successor liability is at least colorable. See, e.g., Priestly v. Headminder, Inc., 647 F.3d 497, 504-06 (2d Cir. 2011) (even in face of default, court may decline to award relief unless "the complaint's well pleaded allegation . . . adequately support the application of the de facto merger doctrine") (quoting Au Bon Pain Corp., 653 F.2d at 65 (after default "court has discretion under Rule 55(b)(2) to require proof of necessary facts and need not agree that the alleged facts constitute a valid cause of action")).

In the absence of any briefing of this question by either litigant, we decline to explore British law on corporate-successor liability -- arguably the body of law most likely to be applied if the issue were contested. Cf. JobPro Temporary Servs., Inc,v. Giftcorp. Inc., 2014 WL 3418895, at *5-6 (Conn. Super. Ct. Jan. 7, 2014) (applying forum choice-of-law rules of contract law to successor liability question). Rather, we briefly refer to domestic law on the point, which appears comparable whether viewed as federal common law or the law in New York. See, e.g., New York v. National Service Inds., Inc., 460 F.3d 201, 209 (2d Cir. 2006).

"[A] corporation that purchases the assets of another corporation is generally not liable for the seller's liabilities." Id. Accord, e.g., Schumaker v. Richards Shear Co., 59 N.Y.2d 239, 244-45, 464 N.Y.S.2d 437, 451 (1983). The courts have recognized four exceptions, premised on pleading and proof that "(1) [the successor corporation] expressly or impliedly assumed the predecessor's tort [or contract] liability, (2) there was a consolidation or merger of seller and purchaser, (3) the purchasing corporation was a mere continuation of the selling corporation, or (4) the transaction is entered into fraudulently to escape such obligations." Id. at 245, 464 N.Y.S.2d at 451; National Servs. Industs., 460 F.3d at 209.

Plaintiff's complaint does not offer any allegations suggesting that the status of defendant meets any of these alternative tests. Indeed, all that he asserts is that defendant is the successor to the original Proteus entity, and that general and conclusory allegation is inadequate to plead such a theory, even in the face of defendant's default. See, e.g., Priestly, 647 F.3d at 505-06 (holding that pleading's assertion "that there was a de facto merger" was insufficient to permit default award on

that theory) (citing <u>inter alia Ashcroft v. Iqbal</u>, 556 U.S. 662
(2009)).[8]


In view of the absence of a pleading that would lay the
basis for plaintiff pursuing a claim against the defendant for
the contractual defaults or other liabilities of the first
Proteus entity, we conclude that he should not be awarded damages
against the defendant for payments made to its predecessor under
the original contract, except for the £30,000 actually
acknowledged, and apparently received, by defendant, and that may
be awarded, as noted, in the form of contract damages.


### C. **Unjust Enrichment**


Plaintiff also seeks $83,590.50 under a claim of unjust
enrichment. (Pl.'s Mem. 4-5). This claim appears to parallel his
conversion claim, in that he seeks reimbursement for all payments
made to the original Proteus entity under the first contract.

---

[8] The pleading requirement of plausibility embodied in <u>Iqbal</u>
applies to the complaints of <u>pro se</u> plaintiffs. <u>See</u>, <u>e.g.</u>, <u>Skates
v. Vanbockstaele</u>, 2013 WL 658253, at *2 (S.D.N.Y. Feb. 25, 2013);
<u>Alli v. City of New York</u>, 2012 WL 4887745, at *2 (S.D.N.Y. Oct.
12, 2012)(citing cases). In any event, we note that plaintiff in
this case is an attorney and hence not an untutored litigant.

Under New York law, when a valid and enforceable written contract governs a particular subject matter, a plaintiff may not recover for both breach of contract and unjust enrichment. Gene Codes Forensics, Inc. v. City of New York, 812 F. Supp.2d 295, 305 n.9 (S.D.N.Y. 2011) (citing Goldman v. Metropolitan Life Ins. Co., 5 N.Y.3d 561, 572, 807 N.Y.S.2d 583, 587 (2005) ("[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter")). A plaintiff may only bring quasi-contract claims in addition to a breach of contract claim "where there is a dispute over the existence, scope or enforceability of the putative contract. Reilly v. NatWest Markets Group, Inc., 181 F.3d 253, 263 (2d Cir. 1999).

Here, plaintiff states that defendant was unjustly enriched by selling the body and chassis designated for plaintiff to a third party for benefits. (Pl.'s Aff. Ex. H). For relief, plaintiff requests an award equal to all of the payments that he made to defendant and its predecessor. (Pl's Mem. 4-5). However, under plaintiff's breach-of-contract theory -- in which he relies on the enforceability of his written contract with defendant -- he uses the same facts to argue that defendant and its predecessor breached their contracts with him by not providing

him with the car he paid for. In short, plaintiff's breach-of-contract claim and quasi-contract claim both arise from the alleged failure by defendant and the original Proteus entity to abide by their agreements to provide him with the Jaguar C-Type. Since the asserted losses to plaintiff arose by virtue of two breached contracts, he is not entitled to recover under a quasi-contract theory. <u>See</u>, <u>e.g.</u>, <u>Verus Pharmaceuticals, Inc. v. Astrazeneca AB</u>, 2010 WL 3238965, at *13 (S.D.N.Y. Aug. 15, 2010) (granting defendant's motion to dismiss plaintiff's unjust-enrichment claim where plaintiff's breach of contract claim and unjust enrichment claim were "based on the same facts."); <u>see also</u> <u>Gene Codes</u>, 812 F. Supp.2d at 305 n.9 ("Here, [plaintiff] relies on the validity and enforceability of the Contract, plainly calling into question the viability of its unjust enrichment claim.").

In any event, for reasons discussed with respect to plaintiff's conversion claim, he cannot recover from the defendant for payments that he made to the predecessor company on the first contract. Thus, there is no basis for granting the requested award on this claim, although, for reasons noted, he should be awarded, as a part of contract damages, his payment of £30,000 that was acknowledged (and apparently ultimately received) by defendant.

D. **Prejudgment Interest**

"In a diversity case, state law governs the award of prejudgment interest." Schipani v. McLeod, 541 F.3d 158, 164 (2d Cir. 2008) (citing Baker v. Dorfman, 239 F.3d 415, 425 (2d Cir. 2000)). Under New York law, "a plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right." N.Y. C.P.L.R. § 5001 (McKinney 1992). See United States Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692, 698 (2d Cir. 1991). Prejudgment interest is calculated at the rate of nine percent per annum. N.Y. C.P.L.R. §§ 5001(a), 5004. As for the means of calculation, under New York law:

> Interest shall be computed from the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred. Where such damages were incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. § 5001(b). See La Framboise Well Drilling, Inc. v. R.J. Dooley & Associates, Inc., 2007 WL 430285, at *5 (S.D.N.Y. Feb. 7, 2007).

Having concluded that plaintiff is entitled to recover damages from breach of contract, we find that prejudgment interest is warranted. Interest should be computed from January 27, 2011, the date of repudiation of the contract, at the statutory rate of nine percent. See, e.g., Stahl Mgmt. Corp. v. Conceptions Unlimited, 554 F. Supp. 890, 895 (S.D.N.Y. 1983) ("Interest will run from the date when defendants' breach was clearly established."). Accrued interest as of September 3, 2014 is $33,084.24.

### E. **Attorneys' Fees**

In the complaint plaintiff seeks an award of attorneys' fees. Since he does refer to that request in his inquest papers, we deem that aspect of his complaint to have been abandoned. In any event, it would be meritless.

"Under the general rule in New York, attorneys' fees are deemed incidental to litigation and may not be recovered unless supported by statute, court rule or written agreement of the parties." Flemming v. Barnwell Nursing Home & Health Facilities, Inc., 15 N.Y.3d 375, 379, 912 N.Y.S.2d 504, 505 (2010). Because

plaintiff has not submitted any evidence that the parties agreed to the payment of attorneys' fees, we decline to award them.[9]

### F. Costs

Plaintiff seeks $1,900.00 in costs, which reflects a $400.00 filing fee and a payment of $1,500.00 to serve process on defendant in England. (Pl's Mem. 3; Gray Aff. Ex. A). These expenses are properly compensable. See 28 U.S.C. §§ 1920; S.D.N.Y. Civil Rules 54.1(10). Moreover, the expense of service in the United Kingdom appears to be reasonable. Therefore, we recommend that plaintiff be awarded $1,900.00 for the costs he expended in pursuing this litigation.

### CONCLUSION

In accordance with the above considerations, we recommend that plaintiff be awarded $102,042.70 in contract damages, plus

_____

[9]    It should be noted that even if there had been a provision in the contract for attorneys' fees, plaintiff is proceeding pro se and therefore would presumptively not be entitled to them. See, e.g., Hammer v. RDR Books, 2011 WL 4388849, at *7 (S.D.N.Y. Sept. 20, 2011) (quoting U.S. Dep't of Justice, Tax Div. v. Hudson, 626 F.3d 36, 39 (2d Cir. 2010)) (holding that attorney appearing pro se cannot recover fees under a theory of breach of contract because "[h]e cannot be reimbursed for work done on his own behalf").

prejudgment interest totaling $33,084.24, and $1,900.00 in costs, or a total of $137,026.94.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable John G. Koeltl, Room 1030, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

Dated: New York, New York
       September 4, 2014

_____
MICHAEL H. DOLINGER
UNITED STATES MAGISTRATE JUDGE

26

Copies of this Report & Recommendation are being mailed today to:

Mr. J. Reid Gray, III, Esq.
15 Lonetown Road
Redding, Connecticut 06896

Proteus Sports and Racing Cars Ltd.
Unit 20, Easter Park
Benyon Road
Silchester, Reading
England RG7 2PQ